# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs at Knoxville May 20, 2014

## STATE OF TENNESSEE v. MICHAEL WARREN FULLER

**Appeal from the Criminal Court for Davidson County**
**No. 2005-C-2405    Mark Fishburn, Judge**

---

**No. M2013-01642-CCA-R3-CD - Filed June 20, 2014**

---

Michael Warren Fuller ("the Defendant") was convicted by a jury of aggravated robbery. The trial court subsequently sentenced the Defendant to thirty years' incarceration. Following a hearing on the Defendant's motion for new trial, the trial court reduced the Defendant's sentence to twenty-eight years. On appeal, the Defendant challenges the sufficiency of the evidence supporting his conviction. He also contends that his sentence is improper. After a thorough review of the record and the applicable law, we affirm the Defendant's conviction. We remand, however, for the trial court to sentence the Defendant pursuant to the 2005 Amendments to the Tennessee sentencing statutes.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Criminal Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and D. KELLY THOMAS, JR., JJ., joined.

Joshua L. Brand (on appeal and at hearing on motion for new trial); and Dumaka Shabazz (at trial), Nashville, Tennessee, for the appellant, Michael Warren Fuller.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Senior Counsel; Victor S. (Torry) Johnson III, District Attorney General; and Sarah Davis, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

A Davidson County Grand Jury indicted the Defendant on one count each of especially aggravated kidnapping and aggravated robbery. The Defendant proceeded to a jury trial December 4-5, 2006.

Jeffrey W. Binkley testified at trial that he worked at Binkley Lumber Company in north Nashville. He was familiar with Burroughs Property Management ("BPM") because the business was located across the street from Binkley Lumber Company. At approximately 9:30 or 10:00 a.m. on June 7, 2005, Binkley called the police upon observing the following events at BPM: "one guy was knocking on the door [of BPM] and another one was crouched down beside the building with a gun, so I thought [Johnny Burroughs] was going to get robbed." According to Binkley, "when [Burroughs] unlocked the door, they grabbed the door and jerked it open and run [sic] in the building." Binkley was present when a police officer arrived, and he pointed the police officer to the building where the men had entered. At that point, the officer "got the shotgun out and the two guys came out of the building, so he told them to get down on the ground, they didn't get down on the ground, they run [sic] back into the building." Binkley continued,

> After that, . . . the police officer was still there by himself, one of them came out and had a gun in [Burroughs'] back and the police officer told him to get down, and he [the perpetrator] threw the gun at the police and took off running down the street. And then, backup [sic] and they brought the dogs and told the person that was inside the building to come out or they were going to send the dogs in, so he came out.

According to Binkley, when this individual exited the building, "[h]e was crawling on his stomach." Binkley could not remember whether this individual was the man who initially was holding the gun.

Johnny Burroughs testified that he was seventy-five years old at the time of trial and owned BPM. He testified that on June 7, 2005, a man he identified as the Defendant knocked at his door at BPM, saying that he needed to rent a house. When Burroughs opened the door, two men "rushed in and knocked [Burroughs] down and stomped [him] and one of them held their foot on [his] head and neck and they emptied [his] pockets." According to Burroughs, one man then went upstairs and was "dumping everything out and . . . getting what they could." During that time, one of the men shot his gun into the floor approximately two feet above Burroughs' head as he lay in the floor.

Burroughs continued,

> And then when it was over, they started out the door and one of them said to the other one, "Get back in there." So, I thought maybe the police were there, and it was, police was right there waiting. And then, one runs upstairs and throws everything out of his pocket and throwed (as stated) my gun over behind the couch and the officers came in and asked him to come out there three or four times and they wouldn't do it, and they told them, well, we going to put the dog on you, and he come out then, like this, walking on his elbows and on his knees, and they put him under arrest and handcuffed him and took him away.

Burroughs confirmed that he saw one of the two individuals with a gun and that, in fact, one of the men pointed the gun in Burroughs' face as they entered BPM. He noted that both of the men pushed him to the ground. The two men retrieved Burroughs' billfold from his front, left pocket and confiscated the $400 cash inside. They also took $559 in "loose cash" from Burroughs' pocket. They continually asked Burroughs where his safe was located, but Burroughs explained to them that he did not have a safe. Every time the individuals asked Burroughs where his safe was located, they both threatened to kill him.

As a result of this incident, Burroughs "can't see out of []his right eye, there's a blood clot behind it, and it clears up a little bit sometime and it fades out." He explained that he began having trouble with his eye the week after the robbery. He also noted that he had a black eye as a result of being shoved onto the ground.

On cross-examination, Burroughs acknowledged that, the day before trial, he could not confirm that the Defendant was one of the individuals involved in the robbery. Burroughs noted, however, that from where he was sitting that day he was not able to see the Defendant clearly due to his vision problems. Later that day, Burroughs was able to see the Defendant's face more clearly and could identify the Defendant as one of the participants. Burroughs also acknowledged that, at a preliminary hearing, he testified that the individual with the Defendant was the only person threatening Burroughs with his life. On redirect examination, however, Burroughs confirmed that both individuals threatened him. Burroughs denied that either individual grabbed him and threatened him or the police when exiting the building.

Officer Richard J. Martin with the Metro Nashville Police Department ("MNPD") testified that he was on duty during the day on June 7, 2005. He received a call that two black males had entered a business at 2022 Clarksville Highway. Officer Martin, coincidentally, was close to the business, so he arrived at the scene "within seconds." Officer

Martin then retrieved his shotgun, positioned himself behind his vehicle, and waited for backup. He testified,

> I heard someone say, "It's that building," and there's a red brick two-story building immediately to my right. I observed a vehicle running, sitting between the building that said 2022 Clarksville Highway and that red brick building facing McDaniel Street. As I began to move towards the red brick building with my shotgun, the door swung open, and Mr. Burroughs . . . was the first one out the door, being pushed by another man, couldn't see the other man's hands at all, but he was pushing him, and the other man was yelling "I'm here helping him." There was another gentleman that was immediately behind those two individuals that was also there, and after a few seconds the man that was pushing Mr. Burroughs from behind dropped the gun and he fled on foot, I guess that would be South on Clarksville Highway towards D.B. Todd Boulevard. The defendant seated over there, ran back inside the red brick building. My backup arrived on the scene. I got Mr. Burroughs to get behind my patrol car. We just – we took cover and waited for backup. As the backup arrived, I was telling dispatch and other officers that the description of the man that ran away had dropped the gun. In the meantime, I tried to secure all sides of the building as best I could to make sure the other one wasn't going to get away. Backup arrived approximately two minutes later. [The Defendant] came out of the business and I took him into custody.

Officer Martin "assum[ed]" that the individual pushing Burroughs out the door had a gun.

Once backup arrived at the scene, the officers gave verbal commands to the Defendant to exit the building, and the Defendant complied within approximately two minutes. Officer Martin could not recall what the Defendant was wearing on that day. A K-9 unit also arrived at the scene but was unable to track the individual who fled the scene.

On cross-examination, Officer Martin further explained that, as Burroughs and the perpetrators were exiting the building, the Defendant was "directly behind the gentleman that was pushing Mr. Burroughs, in [Officer Martin's] opinion, using him as a shield." According to Officer Martin, the Defendant ran back inside the building approximately five to ten seconds after exiting the building.

Detective Mark Fielden with the MNPD testified that on June 7, 2005, he investigated a robbery involving the victim, Burroughs. He stated,

Well, I drove to the business where this happened. . . . When I got out of my car, I pretty quickly noticed a semiautomatic handgun that was lying on the pavement of the business relatively close to the front door. There was also a magazine to the same gun that was closer to the door, it was separate from the gun itself. I talked to Mr. Burroughs, got a statement from him about what happened.

Detective Fielden, upon entering the building, found "loose money" on the ground on the second floor. He also found a handgun located behind a couch. Detective Fielden confirmed that Burroughs identified the handgun as his own gun. Detective Fielden also confirmed that he recovered a bullet from the scene.

Detective Russell Thompson with the MNPD testified that he was assigned the present case when the lead detective, Detective Ray Hahn, retired. Based on fingerprint evidence that Detective Thompson had collected, he had arrested another individual suspected of committing this crime with the Defendant. Detective Thompson also stated that ballistics testing in this case identified the cartridge found at the scene as having been fired through the semiautomatic weapon found outside. On cross-examination, Detective Thompson acknowledged that none of the fingerprint or ballistics testing indicated that the Defendant handled the semiautomatic weapon.

Burroughs was re-called to testify. He denied that either of the individuals who entered his business that day tried to "help" him or stop each other from participating in the events that transpired.

At the conclusion of the State's proof, the defense moved for a judgment of acquittal, which the trial court denied. The Defendant chose not to testify and presented no proof. Following deliberation, the jury acquitted the Defendant as to his especially aggravated kidnapping charge and convicted the Defendant as to his aggravated robbery charge.

At the sentencing hearing, Burroughs testified as follows regarding his injuries sustained as a result of the incident:

I still can't see out of this eye, just a shadow where they had knocked me down on the floor and stomped on my head and I started just going out, and in two or three days I went to the eye doctor and he said there's a broken vein in my eye on my eyesight, and it's been kind of hard to get . . . used to being one-eyed.

Burroughs confirmed that, prior to this incident, he did not have any vision loss. At the time of the incident, Burroughs was seventy-four years old. At the conclusion of Burroughs' testimony, the presentence report was admitted as an exhibit without objection from the defense. The Defendant provided a statement of allocution.

In sentencing the Defendant, the trial court found the Defendant to be a Range III, persistent offender, given that the Defendant had three prior Class B felony convictions. See Tenn. Code Ann. § 40-35-107 (Supp. 2005). As an enhancement factor, the trial court considered the fact that the Defendant had a criminal history above that required to establish his range as a Range III offender. The trial court also considered as an enhancement factor that the Defendant "treated, or allowed the a victim to be treated, with exceptional cruelty during the commission of the offense." Tenn. Code Ann. § 40-35-114(5) (Supp. 2005). Additionally, the trial court considered as enhancement that the Defendant, on a previous occasion, had "failed to comply with the conditions of a sentence involving release into the community." Id. § -114(8). The trial court did not afford any weight to mitigating factors. Accordingly, the trial court sentenced the Defendant to thirty years' incarceration.

The Defendant failed to file a timely motion for new trial or notice of appeal. On January 7, 2008, the Defendant filed for post-conviction relief, claiming that he had been denied the effective assistance of counsel at trial. On January 25, 2012, the court denied post-conviction relief but granted a delayed appeal, including permission for the Defendant to file a motion for new trial. Following the hearing on the Defendant's motion for new trial, the court set aside the order denying post-conviction relief and stayed post-conviction proceedings until completion of the Defendant's direct appeal. In the trial court's order on the Defendant's motion for new trial, the trial court determined that the evidence presented at trial was sufficient to support the Defendant's conviction. The trial court also determined that it had considered two of the enhancement factors erroneously, noting that the trial court should have applied the Tennessee sentencing statutes in effect prior to the 2005 Amendments. Accordingly, the trial court reduced the Defendant's sentence from thirty years to twenty-eight years. The Defendant timely appealed, challenging the sufficiency of the evidence and his sentence.

## Analysis

*Sufficiency of the Evidence*

The Defendant first argues on appeal that the evidence presented at trial is insufficient to support his conviction for aggravated robbery. Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements

of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our supreme court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

The weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Furthermore, it is not the role of this Court to reevaluate the evidence or substitute its own inferences for those drawn by the jury. State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003) (citations omitted).

As charged in this case, aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear," Tenn. Code Ann. § 39-13-401(a) (2003), "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Tenn. Code Ann. § 39-13-402(a)(1) (2003). "A person commits theft of property if, with the intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103 (2003).

The State's theory of the case at trial was that the Defendant was guilty under a theory of criminal responsibility. A person is criminally responsible for crimes committed by another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts

to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2) (2003). Our supreme court has explained that "[t]he justification for this theory of criminal liability is that, in addition to the primary criminal actor, aiders and abettors should be held accountable for the criminal harms they intentionally facilitated or helped set in motion." State v. Sherman, 266 S.W.3d 395, 408 (Tenn. 2008). As long as the State can prove that a defendant knowingly, voluntarily, and with common intent joined with the principal offender in the commission of the crime, the State may seek to hold the defendant criminally liable as a principal under the theory of criminal responsibility for the conduct of another. Id.; see also State v. Hatcher, 310 S.W.3d 788, 811 (Tenn. 2010). "The requisite criminal intent may be inferred from the defendant's 'presence, companionship, and conduct before and after the offense.'" State v. Crenshaw, 64 S.W.3d 374, 384 (Tenn. Crim. App. 2001) (quoting State v. McBee, 644 S.W.2d 425, 428-29 (Tenn. Crim. App. 1982)). While a person's mere presence during the commission of a crime is not sufficient to confer criminal liability, it is not necessary that he or she take physical part in the crime. Sherman, 266 S.W.3d at 408. Rather, encouragement of the principal actor will suffice. Id. A defendant convicted under a theory of criminal responsibility for the conduct of another is considered a principal offender to the same extent as if he had committed the offense himself. See Hatcher, 310 S.W.3d at 811.

Taken in a light most favorable to the State, the evidence presented at trial is sufficient to establish that the Defendant, through his actions and the actions of his accomplice, deprived Burroughs of his property by forcefully holding Burroughs to the ground and using a gun. The Defendant, along with another male, forcefully entered BPM after the Defendant knocked at the door. According to Burroughs, the Defendant and another male "rushed in and knocked [Burroughs] down and stomped [him] and one of them held their foot on [his] head and neck and they emptied [his] pockets." As the men entered, one of the men pointed a gun in Burroughs' face. The two men repeatedly threatened to kill Burroughs if he did not tell them the location of his safe. During that time, one of the men shot his gun into the floor approximately two feet above Burroughs' head. The men retrieved $400 cash from Burroughs' billfold and $559 in "loose cash" from his pocket. The jury clearly had sufficient evidence to convict the Defendant of aggravated robbery. Accordingly, the Defendant is entitled to no relief on this issue.

*Sentencing*

The Defendant also challenges the length of his sentence. Prior to imposing a sentence, a trial court is required to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections ] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (Supp. 2005).

The referenced "principles of sentencing" include the following: "the imposition of a sentence justly deserved in relation to the seriousness of the offense" and "[e]ncouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs." Tenn. Code Ann. § 40-35-102(1), (3)(C) (Supp. 2005). Moreover, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Tenn. Code Ann. § 40-35-103(4), (5) (2003).

Our Tennessee Criminal Sentencing Reform Act ("the Sentencing Act") also mandates as follows:

In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

-9-

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Additionally, a sentence including confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1).

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision." Id. at 709. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401 (Supp. 2005), Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

The Range III sentence for aggravated robbery, a Class B felony, see Tenn. Code Ann. § 39-13-402(b), is between twenty and thirty years, see Tenn. Code Ann. § 40-35-112(c)(2) (2003). Here, following the motion for new trial, the trial court sentenced the Defendant to twenty-eight years, which is near the top of the statutory range. See id. § -112(b)(1).

At the sentencing hearing, the trial court considered as enhancement factors that the Defendant had "a previous history of criminal convictions or criminal behavior" beyond those required to establish the Defendant as a Range III offender, Tenn. Code Ann. § 40-35-114(1); that the Defendant "treated, or allowed the a victim to be treated, with exceptional cruelty during the commission of the offense," Tenn. Code Ann. § 40-35-114(5); and that the Defendant, on a previous occasion, had "failed to comply with the conditions of a sentence involving release into the community." Id. § -114(8). Following the hearing on the motion for new trial, however, the trial court decided that the latter two factors were considered erroneously. Therefore, the sole enhancement factor considered for the new, twenty-eight-year sentence was the Defendant's criminal history. In reviewing the presentence report, we find that the Defendant's record does not support consideration of this factor. In order to be sentenced as a persistent offender, as applicable in this case, the Defendant must have "[a]t least two (2) Class A or any combination or three (3) Class A or Class B felony convictions if the defendant's conviction offense is a Class A or Class B felony." Tenn. Code Ann. § 40-35-107(a)(2). The presentence report indicates that the Defendant had been convicted of three prior Class B felonies, but the Defendant has no other criminal convictions.[1] Accordingly, the trial court's consideration of this enhancement factor was improper.

We note, however, that the trial court erroneously determined that the other two enhancement factors could not be considered in the Defendant's case. The trial court stated in its order modifying the Defendant's sentence that the Defendant should have been sentenced under Tennessee's sentencing statutes that were in effect prior to 2005, which would have required that the jury make findings as to these enhancement factors. See State v. Cross, 362 S.W.3d 512, 528-529 (Tenn. 2012). Upon our review of the case, we disagree with the trial court's determination that the pre-2005 sentencing statutes apply. The Defendant committed this crime on June 7, 2005, which, coincidentally, is the day that the 2005 Amendments took effect. See Tenn. Code Ann. § 40-35-114 Compiler's Notes ("Acts 2005, ch. 353, § 18 provided that the act shall apply to sentencing for criminal offenses *on or after* June 7, 2005.") (emphasis added); 2005 Tenn. Pub. Acts ch. 353, § 18. Therefore, the trial court should have sentenced the Defendant under the 2005 Amendments to the Sentencing Act.

Based on the fact that the trial court applied the pre-2005 sentencing statutes in determining the Defendant's sentence, we consider it necessary to remand this case for the

---

[1] The presentence report does indicate that the Defendant had several prior arrests, but all charges ultimately were dismissed. With nothing more, mere proof of the arrests is not enough to support a finding of criminal behavior. See State v. Carico, 968 S.W.2d 280, 288 (Tenn. 1998) ("The Court of Criminal Appeals has properly held that merely being arrested or charged with a crime is not 'criminal behavior' within the meaning of the statute.") (citations omitted).

trial court to sentence the Defendant again under the 2005 Amendments to the Sentencing Act in a manner consistent with this opinion.

## CONCLUSION

For the reasons set forth above, we affirm the Defendant's conviction. We remand the case, however, to the trial court for re-sentencing.

_____
JEFFREY S. BIVINS, JUDGE